### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND/ODESSA DIVISION

UNITED STATES OF AMERICA,

v.                                                                    MO:22-CR-00154-DC

(1) RAYMOND CHARLES JR,

## MEMORANDUM OPINION

Much like Bill Murray's character in the movie, "Groundhog Day," who repeats the same day over and over, the Court awakens to the same Second Amendment issue it recently covered in *United States v. Collette*. Section 922(g)(1), which prohibits felons from possessing firearms, is once again the topic. This recurrence was expected, anticipated actually, because, as this Court consistently states, *Bruen* transformed and left uncharted much of the legal landscape.

## BACKGROUND

After he was pulled over by police, Defendant Raymond Charles Jr. told officers he had a firearm in his vehicle. Upon searching the vehicle, officers discovered a loaded Ruger P90 .45 caliber semi-automatic handgun. And when the police conducted a background check, they discovered Defendant had felony convictions for residential burglary and possession with intent to distribute narcotics.

Defendant was charged with one count of knowingly possessing a firearm as a felon under 18 U.S.C. § 922(g)(1) in July 2022. Defendant recently filed the Motion to Dismiss

Indictment now before the Court.[1] So recently was it filed, in fact, he did so with little time to spare—his trial starts tomorrow.

And although this Court found § 922(g)(1) constitutional just last week, Defendant argues that the Court's analysis was incorrect and § 922(g)(1) is facially unconstitutional and as applied to Defendant. So, similar to "Groundhog Day," the Court returns to § 922(g)(1)'s constitutionality and Defendant's arguments below.

## DISCUSSION

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[2] In *Heller*, the Supreme Court held that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."[3] And just last term, in *Bruen*, the Supreme Court held "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."[4]

## I.   The Supreme Court in *Bruen* laid out a new standard for courts to use when analyzing firearm regulations.

Before *Bruen*, courts of appeals had "coalesced around a "two-step" framework" when assessing Second Amendment claims, combining a historical analysis with means-end scrutiny.[5] For the first step, the court would establish the Second Amendment's original

---

[1] Doc. 43.
[2] U.S. Const. Amend. II.
[3] *D.C. v. Heller*, 554 U.S. 570 (2008).
[4] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022).
[5] *Id.* at 2125.

scope through a historical analysis.[6] If the regulated conduct fell outside the Amendment's original scope, "the analysis can stop there; the regulated activity is categorically unprotected."[7] But if not outside the Amendment's scope or "inconclusive," the court would proceed to step two.[8]

In step two, a court would generally analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."[9] If the "core" Second Amendment right—self-defense in one's home—was burdened, the court would apply strict scrutiny.[10] Otherwise, it would apply intermediate scrutiny, considering whether the Government had shown that the regulation is "substantially related to the achievement of an important governmental interest."[11]

But in *Bruen*, Justice Thomas stated the two-step approach was "one step too many."[12] In its place, Justice Thomas enumerated a new standard courts must follow:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[13]

So the threshold question is whether the Second Amendment's plain text covers Defendant's conduct.

---

[6] *E.g.*, *United States v. Focia*, 869 F.3d 1269, 1285 (CA11 2017).

[7] *United States v. Greeno*, 679 F.3d 510, 518 (CA6 2012).

[8] *E.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (CA7 2019).

[9] *Id.*

[10] *Kolbe v. Hogan*, 849 F.3d 114, 133 (CA4 2017).

[11] *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (CA2 2012).

[12] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

[13] *Id.* at 2129–30.

## II.   *Bruen*'s First Step: "possessing" a firearm under the Second Amendment's plain text.

Defendant is charged with violating 18 U.S.C. § 922(g)(1), which makes it "unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year to . . . possess any firearm or ammunition . . . which has been shipped or transported in interstate or foreign commerce."

The Court has already answered the question of whether "keep and bear arms" covers possession of a firearm—it does. According to Justice Scalia in *Heller*, to "keep arms" means to "have weapons." The plain meaning of "have" is "to be in possession of."[14] Thus, the Second Amendment's "keep and bear arms" language plainly encompasses possession.

The Court reiterates this is where *Bruen* conflicts with *Heller*. *Heller* called proscriptions against felons possessing guns "presumptively lawful."[15] In contrast, because possession is covered by the Second Amendment's plain text, *Bruen* makes a felon's possession of a firearm "presumptively constitutional."[16] *Bruen* is the controlling standard, but this conflict—the presumption of constitutionality—is what places the heavy burden on the Government.

In any event, *Bruen*'s first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm. Because the Constitution presumptively protects possessing a firearm, § 922(g)(1)'s constitutionality hinges on whether regulations prohibiting felons from possessing a firearm are consistent with the Nation's historical tradition of firearm regulation.

---

[14] *Have*, OXFORD ENGLISH DICTIONARY (3d ed. 2015).
[15] *D.C. v. Heller*, 554 U.S. 570, 627 n.26 (2008).
[16] *Bruen*, 142 S. Ct. at 2129–30.

III.   *Bruen*'s second step: the historical analysis.

This Court recently undertook the historical analysis in *Quiroz* and *Collette*.[17] But for completeness's sake, the Court repeats that analysis below, starting with § 922(g)(1)'s history.

**A. Felons in possession: the Federal Firearms Act of 1938 to present.**

The history of prohibiting felons from possessing firearms began in 1938, when Congress passed the Federal Firearms Act ("FFA").[18] The FFA prohibited those convicted of "a crime of violence" from shipping or transporting any firearms or ammunition in interstate commerce.[19] The Act's proscriptions were limited to those convicted of "crimes of violence," which was commonly understood to include only those offenses "ordinarily committed with the aid of firearms."[20]

According to the legislative history, Congress implemented the FFA to combat roaming criminals crossing state lines.[21] Without federal laws, ex-convicts would simply cross state lines to circumvent conditions of probation or parole.[22] The FFA's main goal then was to "eliminate the guns from the crooks' hands, while interfering as little as possible with the law-a-biding citizen."[23] In Congress's eyes, those convicted of crimes of violence had already "demonstrated their unfitness to be entrusted with such dangerous instrumentalities."[24]

Yet it wasn't until 1961 that felons were specifically prohibited from possessing firearms. Congress amended the FFA in 1961, removing the "crimes of violence" language,

---

[17] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Collette*, No. MO:22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022).

[18] 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed).

[19] *Id.*

[20] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 702 (2009).

[21] *United States v. Platt*, 31 F. Supp. 788, 790 (S.D.Tex.1940) (citing Record of Hearings on H.R. 9066 Before the House Committee on Ways and Means, 73d Congress).

[22] *Id.*

[23] S.Rep. No. 82, 75th Cong., 1st Sess. 2 (1937).

[24] *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942).

replacing it with a "crime punishable by imprisonment for a term exceeding one year."[25] Congress then expanded gun regulations yet again with the Gun Control Act of 1968 ("GCA").[26] The key amendments for § 922(g) included banning possessing and prohibiting receipt of any firearm that had traveled in interstate commerce.[27] And in 1986, all provisions as well as other sections that limited access to guns by dangerous persons, were separated and recodified under § 922(g).[28] So as of 2022, prohibiting felons from possessing firearms at the federal level is less than 65 years old.

### B. The straightforward historical inquiry.

If a challenged regulation addresses a "general societal problem that has persisted since the 18th century," this historical inquiry is "straightforward."[29] *Heller* did state, although in dicta, that there is a "longstanding" prohibition on felons possessing firearms.[30] Justice Scalia did not elaborate on what he meant by "longstanding." To bolster his argument that prohibiting felons from possessing a firearm is not longstanding, Defendant cites then-Judge Amy Coney Barrett during her tenure on the Seventh Circuit in a case involving § 922(g)(1).

In *Kanter v. Barr*, now-Justice Barrett dissented from the majority opinion upholding the statute's constitutionality.[31] Justice Barrett noted in her dissent that "[t]he only evidence coming remotely close lies in proposals made in the New Hampshire, Massachusetts, and

---

[25] *See* Act of Oct. 3, 1961, Pub.L. No. 87–342, § 2, 75 Stat. 757 (repealed).
[26] Gun Control Act of 1968. Pub.L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 et seq.).
[27] *Id.* tit. I, § 102, 82 Stat. 1213, 1220-21; *id.* tit. III, §. 301, 82 Stat. at 1236 (all codified at 18 U.S.C. § 922(g); Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 925, 82 Stat. 197, 233-34; *id.* tit. VII, § 1202, 82 Stat. at 236.
[28] Firearms Owners' Protection Act, Pub.L. 99–308, § 110, 100 Stat 449 (1986).
[29] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022).
[30] *D.C. v. Heller*, 554 U.S. 570, 626 (2008).
[31] *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J. dissenting).

Pennsylvania ratifying conventions. In recommending that protection for the right to arms be added to the Constitution, each of these proposals included limiting language arguably tied to criminality."[32]

But that doesn't mean no historical evidence exists supporting disarming felons. Like Justice Barrett argues in *Kanter*, Pennsylvania's ratifying convention provides the strongest evidence.[33] In the convention, the influential Pennsylvania Minority suggested that the right to arms be guaranteed "unless for crimes committed, or real danger of public injury from individuals."[34] The Massachusetts and New Hampshire ratifying conventions also provide evidence, although to a lesser extent.

The Massachusetts convention's proposed amendment was that the Second Amendment "be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms."[35] Likewise, one of New Hampshire's proposed amendments was that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion."[36]

The common concern from all three states' conventions, however, appears to be threatened violence and the risk of public injury, not felons specifically or even criminals in general.[37] What's more, based on the Court's research, historians have pointed out that the British-American colonies "consistently refrained from [disarming] citizens."[38] After

---

[32] *Id.* at 454.

[33] *Id.* at 456.

[34] *Id.* (citing 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681 (1971)).

[35] Bernard Schwartz, The Bill of Rights: A Documentary History 674–75, 681 (1971).

[36] *Id.*

[37] *Kanter*, 919 F.3d at 456.

[38] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 157 (2007).

scouring the colonies' existing legislative records from 1607 to 1815, one historian could not find "a single instance in which [the 14 colonies] exercised a police power to prohibit gun ownership by members of the body politic."[39]

And it wasn't until 1886 that a state court ruled on a firearm regulation that regulated "the condition of a person—rather than directly regulating his manner of carrying."[40] There, in *Missouri v. Shelby*, the Supreme Court of Missouri upheld a ban on carrying a deadly weapon while intoxicated.[41] So even with a longstanding general concern for public safety, history lacks direct examples about felons specifically. But just because there are no straightforward examples does not mean the Court's historical inquiry stops there.

## IV.    *Heller*, other constitutional provisions, and "the people."

With the straightforward historical inquiry unclear, a more nuanced approached is necessary. When a more nuanced approach is needed, courts can reason by analogy, which involves finding a historical analogue that is "relatively similar" to the modern regulation.[42]

The challenged regulation in this case, like other § 922 regulations, categorically restricts "who" may exercise their Second Amendment rights. Under the Second Amendment, the "who" imbued with the right to keep and bear arms is "the people"—a term of art. But this term of art doesn't appear only in the Second Amendment.

The Constitution's first words trumpet, "We the people," a sharp contrast to the British view that the sovereignty of the people was embodied in the monarchy.[43] That contrast was intended; the founders rejected British notions of "sovereign" governmental

---

[39] *Id.* at 142.

[40] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 711 (2009).

[41] 2 S.W. 468 (Mo. 1886).

[42] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022).

[43] U.S. Const. pmbl; Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425. 1435 (1987).

omnipotence.[44] The founders instead placed "that pure, original fountain of all legitimate authority" with the people.[45] Starting with "the people" was on purpose—"words made flesh by the constitution itself. The Constitution, after all, was not just a text, but an act—a doing, a constitut*ing*."[46] And these "words made flesh" are not only referenced in the preamble and the Second Amendment.

### A.  How Heller defined "the people."

Justice Scalia's majority opinion in *Heller* highlighted that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all *members of the political community*, not an unspecified subset."[47] Yet this Court notes that Justice Scalia slightly altered the Supreme Court's previous definition of "the people" from *United States v. Verdugo-Urquidez*.[48] There, the Supreme Court had previously defined "the people" as "persons who are part of a national community."[49]

So in effect, Justice Scalia narrowed the definition of "the people" to those with the rights of the "political community." *Heller*'s definition then implies that "the people" means only those with political rights.

History supports defining "the people" that way. For example, at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury

---

[44] Amar, 96 YALE L.J. at 1435 (1987).
[45] THE FEDERALIST NO. 22, at 152 (A. Hamilton); *see also id.* No. 49, at 313 (J. Madison) ('the people are the only legitimate fountain of power').
[46] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998).
[47] *D.C. v. Heller*, 554 U.S. 570, 580 (2008) (emphasis added).
[48] 494 U.S. 259, 265 (1990).
[49] *Id.*

were thought of as equal to keeping and bearing arms because all were so-called "political rights."[50]

And the historical support is not out-of-bounds with courts post-*Heller*. Indeed, courts post-*Heller* have followed *Heller*'s implication that "the people" means only those with political rights. For example, in *United States v. Portillo-Munoz*, the Fifth Circuit held that Second Amendment rights do not extend to undocumented immigrants because they are not among "the people" of that amendment.[51] *Heller* described Second Amendment rights as inuring to "law-abiding, responsible citizens" and "all Americans."[52] Therefore, because undocumented immigrants are not law-abiding citizens, Americans, or members of the political community, they could be excluded from "the people."[53]

Besides defining "the people," *Heller* also states that "the people" means the same thing throughout the Constitution.[54] Indeed, both *Heller* and *Bruen* recognize a consistent usage within the Constitution.[55] Interpreting an individual provision in the context of the Constitution's full text is not novel. Indeed, Chief Justice Marshall reasoned over 200 years ago that the Constitution calls for a "fair construction of the whole instrument.[56] Therefore, if the meaning is the same throughout the Constitution, other constitutional provisions enshrining rights or powers to "the people"—and critically, who can be categorically excluded from "the people"—provide similar historical analogues.

---

[50] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998).
[51] 643 F.3d 437, 440 (5th Cir. 2011).
[52] *Id.* at 442.
[53] *Id.*
[54] *D.C. v. Heller*, 554 U.S. 570, 580 (2008).
[55] *Id.*; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).
[56] *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 406 (1819) (Marshall, C.J.).

That said, the Court acknowledges the tension such an interpretation creates. Like Justice Stevens noted in his *Heller* dissent, Justice Scalia failed to harmonize his restriction of "the people" to "law-abiding, responsible citizens" with its assertion that "the people" means the same group in the First and Fourth Amendment.[57] Justice Scalia limited "the people" by defining it as "members of the political community." "But the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions."[58]

This tension has created an ongoing debate, but this Court does not wade into that debate. Whether "the people" is consistent across all constitutional provisions or not, the tradition of categorically excluding certain groups from the rights and powers of "the people" still provides useful analogies.

**B.  Restrictions on the power of "the people" to vote in Section 2, Article I.**

*Heller* defined "the people" as members of the political community, implying the phrase is limited to those with political rights like voting. And analogous to the Second Amendment, the constitutional provision bestowing the power of choosing the House of Representatives also gives that power to "the people."

Section 2, Article I of Constitution states, "the House of Representatives shall be composed of Members chosen every second Year by the People of the several States."[59] Put simply, it's the right of the people to vote. And excluding those convicted of a crime from the people's right to vote does have a "longstanding" historical tradition in this country.

---

[57] *Heller*, 544 U.S. at 644 (Stevens, J. dissenting).
[58] *Id.*
[59] U.S. Const. art. I, §2.

Indeed, there was a "longstanding" historical tradition ever since ratification that those convicted of a crime could be excluded from the right to vote.[60] For example, one year after the Second Amendment's ratification, Kentucky's Constitution stated, "[l]aws shall be made to exclude from . . . suffrage those who thereafter be convicted of bribery, perjury, forgery, or other high crimes and misdemeanors."[61] Vermont's Constitution followed one year later, authorizing the removal of voting rights from those engaged in bribery or corruption during elections.[62] As of 2022, only two states and the District of Columbia do not restrict felons' voting rights.[63]

So if the definition of "the people" is consistent throughout the Constitution—and it has been historically constitutional to exclude those convicted of a crime from "the people" under Section 2, Article I —it would also be constitutional then to exclude those groups from the Second Amendment's kindred "political right."

**C. Regulating the rights of "the people" to assemble.**

Another constitutional provision granting rights to "the people" is the First Amendment's Assembly-and-Petition clause. The First Amendment states, "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The "very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably."[64] But this right is not absolute—the Supreme Court has excluded groups from the people's right of assembly.

---

[60] *Id.* at 605.
[61] Kentucky Const. art. VIII § 1.2 (1792).
[62] Vermont Const. Ch. II § 34 (1793).
[63] State Voting Laws & Policies for People with Felony Convictions, BRITANICA (as of August 1, 2022) State Voting Laws & Policies for People with Felony Convictions - Felon Voting - ProCon.org.
[64] *United States v. Cruikshank*, 92 U.S. 542, 352 (1875).

In *De Jonge v. Oregon*, the Supreme Court declared the right to peaceful assembly "equally fundamentally" with other First Amendment clauses.[65] There, De Jonge was charged under a state criminal syndicalism statute after speaking at a Communist party meeting.[66] Although the objectives of the Communist Party are heinous, the Supreme Court held that De Jonge "still enjoyed his personal right . . . to take part in a peaceable assembly having a lawful purpose."[67]

Yet the Supreme Court also highlighted the right of assembly "without incitement to violence or crime."[68] Indeed, much like the right to keep and bear arms, the First Amendment's right to assembly can be abused to incite violence or crime. Thus, legislation protecting against such abuses would be constitutional if "made only against the abuse."[69] The rights themselves may not be curtailed.[70]

The Supreme Court has also held that the Government can restrict the right to assembly when there is a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order."[71] Or like the Supreme Court held in *Brandenburg v. Ohio*, only when "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action" can the Government prevent that advocacy.[72] Prior restraints against such dangers, however, incur a heavier burden.

---

[65] 299 U.S. 353, 364 (1937).
[66] *Id.* at 359.
[67] *Id.* at 365.
[68] *Id.*
[69] *Id.* at 364.
[70] *Id.* at 365.
[71] *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940).
[72] *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

But in the Second Amendment context, restrictions against those already convicted of a crime, for example, would not be a prior restraint—they have already been found guilty in a constitutionally sufficient proceeding. Likewise, the right of the people does not protect violent actors or criminals. Indeed, those who abuse the right and jeopardize public safety, peace, or order can be excluded from "the people." So if "the people" means the same under the First and Second Amendments—and those who abuse their rights to commit crimes and violence can be constitutionally excluded from the First Amendment's protections—the same may be excluded from the Second Amendment's protections.

## V.   Defendant argues that *Bruen* should be interpreted inflexibly, functioning more as a regulatory straitjacket.

The Court's historical analysis accords with then-Judge Barrett's statement while dissenting in the Seventh Circuit's *Kanter* that, if strictly looking at this Nation's historical tradition of felons and firearms, "[h]istory does not support the proposition that felons lose their Second Amendment rights solely because of their status as felon."[73]

The critical question lower courts face then, is how strictly should *Bruen* be followed? Justice Thomas made clear that courts post-*Heller* didn't engage in the necessary constitutional analysis, deferring too often to the legislature through intermediate scrutiny.[74] This Court agrees that such deference made *Bruen* necessary. But how strict—or loose—an interpretation *Bruen* requires hasn't been clarified, leaving important questions.

For example, if the historical analysis must be so tightly constrained to historical analogies involving categorical restrictions of *only* felons and firearms, like Defendant argues

---

[73] *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting).
[74] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022).

here, there are likely very few (if any) modern firearm regulations that would survive. That might have been *Bruen*'s point. But this Court thinks that such a strict interpretation turns the historical analysis into the "regulatory straitjacket" shunned by *Bruen*.[75]

And the fact that the Justices have consistently reiterated that the rulings in *Heller*, *McDonald*, and *Bruen* did not change the Supreme Court's opinion on felons and firearms bolsters this Court's opinion that *Bruen* is not intended to be read inflexibly. Indeed, Justices Scalia, Alito, and Kavanaugh have all restated the sentiment against felons possessing firearms.[76]

The Court also noted the concerns of reading *Bruen* so strictly in its *Quiroz* opinion. There, the Court highlighted the heavy burden the historical analysis places on the Government, especially when around 1791, firearms represented tools to protect a homestead in the wilderness and to hunt for food.[77] Technological advancement in transportation and population density are examples of modern developments that have changed societal perception around firearms since the founding. Yet they aren't the only pitfalls a court would run into while reading *Bruen* so inflexibly.

### A. The expanding class of felonies could make finding specific historical analogies an absurdity.

For one thing, the class of crimes constituting felonies has exploded over the last century. The original idea of a "felony" at common law was "intertwined with the

---

[75] *Id.* at 2133.
[76] *See D.C. v. Heller*, 554 U.S. 570, 627 n.26 (2008) (Scalia, J.); *McDonald v. City of Chicago*, Ill., 561 U.S. 742, 786 (2010) (Alito, J.); *N. Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring).
[77] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, *8 (W.D. Tex. Sept. 19, 2022).

punishments of death and civil death."[78] But even then, it's hard to identify a specific definition for "felony" at the founding.[79]

In any event, now-Justice Barrett in her *Kanter* dissent pointed to how "immense" a category of crimes § 922(g)(1) captures, encompassing "those who have committed any nonviolent felony or qualifying state-law misdemeanor."[80] Indeed, Justice Barrett highlighted the absurdity of what the statute covers—from "mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and countless other state and federal offenses.[81] And the Court notes that the conduct § 922(g)(1) encompasses also has changed dramatically from the FFA's original "crimes of violence" limitation.[82] Likewise, some courts have wondered if stealing a lollipop, if declared a felony by the legislature, would serve as a basis to remove someone's Second Amendment rights.[83]

So with more crimes called "felonies" compared to 200 years ago, reading *Bruen* robotically would require the Government in an as-applied challenges to find an analogy specific to the crime charged. For instance, taking one of Justice Barrett's examples above, if someone already convicted of selling pigs without a license in Massachusetts (a felony) was then charged under § 922(g)(1), the Government would need to show a historical tradition

---

[78] *Kanter*, 919 F.3d at 458 (citing 4 William Blackstone, Commentaries on the Laws of England 98 (1769)).

[79] Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 CLEV. ST. L. REV. 461, 465 (2009).

[80] *Kanter*, 919 F.3d at 466.

[81] *Id.*; *See* Mass. Gen. Laws ch. 129, §§ 39, 43; Mich. Comp. Laws § 445.574a(1)(a), (2)(d); *see also, e.g.*, 21 U.S.C. § 676 (violating the Federal Meat Inspection Act in certain ways); 18 U.S.C. § 1621 (committing perjury); Mass. Gen. Laws ch. 266, § 30A (shoplifting goods valued at $100).

[82] 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed).

[83] *See United States v. Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016) ("Can Congress or the States define petty larceny as a felony? Of course. Can a conviction for stealing a lollipop then serve as a basis under § 922(g)(1) to a ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment?").

since the founding of removing firearms from those who sold pigs without a license. That's absurd.

### B. Societal perceptions about felons and guns a century ago would be unthinkable today.

What's more, societal perception surrounding felons and guns has changed within the last 100 years. To illustrate, one of the greatest firearm advancements in history was developed by a felon *while he was in prison*. David Marshall Williams was a bootlegger, who pleaded guilty to second-degree murder in 1921. Because of his skills in the prison workshop, Williams serviced the prison guards' guns and developed four semi-automatic rifles while in prison. Most importantly, Williams designed a floating chamber and short-stroke gas piston that made the historic M1 Carbine possible. And after his release from prison, Williams contracted with almost every major gun company in the United States to help develop firearm technology.[84] Williams' story would likely be unthinkable today.

### C. The same regulation can get conflicting results simply based on the Government's performance.

One could also imagine a scenario where separate courts can come to different conclusions on a law's constitutionality, but both courts would be right under *Bruen*. Say the Government in Court A develops an in-depth historical analysis to uphold a regulation, and Court A finds that the Government met the burden imposed by *Bruen*'s step two. The Government in Court B, in contrast, could face the same regulation as in Court A on the same day, but develop no analysis or respond at all. An inflexible reading of *Bruen* then, would require Court B to declare the regulation unconstitutional. On that basis, the same

---

[84] Peter Suciu, *The Designer of the M1 Carbine was a Convicted Killer*, NAT'L INT. (Dec. 18, 2020) The Designer of the M1 Carbine Was a Convicted Killer | The National Interest.

regulation gets different results based on how adept at historical research the Government's attorneys are in a particular location or the time they have to devote to the task.

**D. Private citizens possessed the same or better weaponry than the military at the founding.**

One last problem with a strict interpretation of *Bruen*'s historical tradition is that during the founding, private citizens possessed the same, if not better, weaponry than the actual colonial military. One example is the private ownership of artillery. Earlier this year, President Joe Biden received four Pinocchios from the Washington Post after saying that since the founding, private citizens "couldn't buy a cannon."[85] That's indisputably incorrect.

The Constitution allows for the "grant of letters of marque and reprisal."[86] In practical terms, this grant allowed private merchant mariners (commonly called "Privateers") to help the early American colonies battle the British's naval superiority. Private citizens then, sanctioned as legal by the early United States Government, were free to outfit their ships with cannons or whatever weaponry was available at the time.[87] Indeed, James Madison granted 500 of these letters to private citizens while president during the War of 1812.[88] So at the start of the 1800s, the founders were aware of—and encouraged—private citizens to carry the weaponry necessary to support the United States.

That said, the Court notes these points not to pretend it knows all the answers; the Court includes itself with the "amateur historians" *Bruen* created. Noting the above is merely

---

[85] Glen Kessler, *Biden's false claims that the 2nd Amendment bans cannon ownership*, WASH. POST (June 28, 2021) Biden's false claim that the 2nd Amendment bans cannon ownership - The Washington Post.
[86] U.S. Const. art. I, § 8, cl. 11
[87] *See* Edgar Maclay, A History of American Privateers (D. Appleton and Company 1899) (Privateers are also the likely source for claims that early citizens could own warships).
[88] *E.g.*, Letter of marque from James Madison, President of the United States of America, to James M. Mortimer, Captain of the private schooner Patapsco. (Sep. 17, 1812) (on file at constitution.org).

to show—without the benefit of the 80-plus amicus briefs filed in *Bruen* and on a drastically shorter timetable than the higher courts—that adopting the strict adherence to *Bruen*'s historical mandate that Defendant argues for becomes a "regulatory straitjacket," which could lead to courts attempting absurd analogical comparisons in the historical record (like selling pigs without a license in Massachusetts).

## VI. Why analogizing the Second Amendment to other constitutional amendments makes sense and follows the Supreme Court's precedents.

Thus, the Court believes that Justice Thomas did not intend that courts, or the Government, attempt absurd analogical attempts—*Bruen* is not so inflexible. Instead, this Court analogizes to the history of other constitutional provisions while trying to faithfully follow *Bruen*.

Defendant argues, however, that the Court's reasoning above and in *Collette* isn't consistent with *Bruen* because the "more nuanced" reasoning by analogy only applies in "other cases implicating unprecedented societal concerns or dramatic technological changes."[89] What's more, Defendant claims this Court's analogizing to other constitutional provisions "does not appear in *Bruen*, and conflicts with *Bruen*'s direction."[90] Defendant's argument fails for three reasons.

### A. *Heller* and *Bruen* analogize to other constitutional provisions just like this Court does.

Defendant first overlooks that both *Heller* and *Bruen* endorsed the using of other constitutional provisions. Indeed, Justice Scalia and Thomas compare the Second Amendment with other constitutional provisions to support their holdings.

---

[89] Doc. 43 at 12.
[90] *Id.*

19

Consider the crux of *Heller*'s reasoning that the Second Amendment enshrined an individual right, analogizing that "[n]owhere else in the Constitution does a 'right' attributed to 'the people' refer to anything other than an individual right."[91] Unambiguously, in all six other constitutional provisions, "the people" means individuals—"members of the political community."[92]

Or like in *Bruen*, Justice Thomas analogizes the Second Amendment with other constitutional provisions to support his "historical tradition" framework, stating this "Second Amendment standard accords with how we protect other constitutional rights."[93] Likewise, Justice Thomas notes that "*Heller* repeatedly compared the right to keep and bear arms" to other constitutional provisions.[94] Thus, *Heller* and *Bruen* both use and endorse the same analogical reasoning that this Court uses here and in *Collette*.[95]

**B. This Court uses *Heller* and *Bruen*'s reasoning to form a syllogism.**

This Court simply analogizes like *Heller* and *Bruen* did, forming their reasoning into a syllogism that Defendant avoids addressing here. In syllogistic form, the Court uses *Heller* and *Bruen*'s methodology to reason as follows:

(1) *Heller* states that "the people" in the Second Amendment means "members of the political community" every time it's mentioned in the Constitution.

(2) Other constitutional provisions have categorically excluded certain groups from the "political community" since this Nation's founding.

---

[91] *D.C. v. Heller*, 554 U.S. 570, 580 (2008).

[92] *Id.*

[93] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).

[94] *Id.*

[95] *United States v. Collette*, No. MO:22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022).

(3) Thus, the groups categorically (and constitutionally) excluded from other constitutional provisions provide analogies in the Second Amendment context.

That doesn't mean those other provisions provide perfect analogies. But neither society nor the Second Amendment exist in a vacuum. And if society can constitutionally exclude certain groups from "the political community" in other constitutional provisions, why would the Second Amendment be any different? Defendant does not answer.

### C. Other constitutional provisions have more developed jurisprudence that can help explain the Second Amendment.

The Court notes that Second Amendment jurisprudence is also underdeveloped compared to other constitutional rights. It wasn't until *Heller* in 2008 that the individual right to keep and bears arms was solidified. And the Second Amendment wasn't incorporated to the states through the Fourteenth Amendment's Due Process Clause until *McDonald* in 2010—almost 100 years after the First Amendment was incorporated.[96] Thus, analyzing the Second Amendment through a historical lens as an individual right, applicable against the states, has only been around for some 14 years. Or put another way, the Supreme Court's jurisprudence that the Second Amendment enshrines an individual right is younger than Twitter, Facebook, or YouTube.

The Court acknowledges that analogizing to other constitutional provisions is not always a perfect fit. But if other constitutional rights have more developed jurisprudence, then it makes sense that the constitutional interpretations of those rights would help explain difficult questions under the Second Amendment. And if the *Bruen* historical framework "accords with how we protect other constitutional rights," it follows that the way other

---

[96] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); *Gitlow v. New York*, 268 U.S. 652 (1925).

constitutional rights are protected accords with how Second Amendment rights are protected.

## VII.   There is still a historical tradition of excluding felons from the rights of "the people."

In short, the Court's opinion here is the same as in *Collette*—there is a historical basis for excluding felons from constitutional rights.[97] *Heller* identified the right to keep and bear arms as held by "members of the political community." And in doing so, Justice Scalia stated that all constitutional provisions mentioning "the people" were consistent. Through the historical analogies above, the Court's inquiry is clear—this Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and powers of "the people." Consistent with *Heller*'s definition, if groups have been categorically excluded under other constitutional provisions bestowing rights to "the people," logic demands that society could also exclude those groups under the Second Amendment.

This is also consistent with the founders' idea of popular sovereignty: giving "the people" the right to govern themselves. Put differently, it's the right within the Constitution's structure to exclude those who abuse the rights of "the people." And the people have wielded this right constitutionally under provisions declared equal by the Supreme Court—so exercising that right under the Second Amendment should be no different. Thus, § 922(g)(1) is constitutional on its face and as applied to Defendant.[98]

---

[97] *Collette*, 2022 WL 4476790, *7.

[98] The Court does not analyze whether there is a difference between violent and non-violent felons. Section 922(g)(1) says "*a crime* punishable by imprisonment for a term exceeding one year," and the Court will not read two competing definitions of "a crime" into the statute. Even so, the Court believes there is still much left unknown post-*Bruen*.

## CONCLUSION

*Heller* states that the rights enshrined in the Second Amendment, and all other constitutional provisions reserving rights and powers to "the people," are held by "members of the political community." Both *Heller* and *Bruen* bolster their reasoning by analogizing the Second Amendment with other constitutional provisions. This Court did the same in *Collette* and reiterates that holding here: this Nation has a longstanding history of excluding felons from the rights of "the people." The Court maintains there are many unknowns in our post-*Bruen* world; few, if any other, courts have engaged these issues in depth. This Court remains faithful to *Bruen*'s framework. Thus, Defendant's Motion to Dismiss Indictment is **DENIED**.

It is therefore **ORDERED** that Defendant's Motion to Dismiss Indictment is **DENIED**. (Doc. 43).

It is so **ORDERED.**

SIGNED this 3rd day of October, 2022.

_____
DAVID COUNTS
UNITED STATES DISTRICT JUDGE